# Eliza J. Davis *v.* E. M. Hukill, Defendant, and L. T. Yoder, Garnishee, Appellant.

*Debtor and creditor—Fraud—Sale—Assignment.*

A bona fide creditor who takes his own money to redeem hypothecated property of his debtor in order to prevent its being sacrificed, and at the same time takes from the debtor an assignment of the property so that he may sell it and pay his debt, is not guilty of constructive fraud against the other creditors of the debtor, and such a creditor is held to a less strict accountability than a mere volunteer who interferes to help the debtor.

Where such a creditor actually redeems the property and takes a transfer of it to himself, he may afterwards employ the former owner to sell the property, and even allow him a large commission therefor without being liable to the other creditors of the former owner, as for a constructive fraud.

In such a transaction the fact that, at the time the other creditors sought to hold liable the creditor to whom the property was assigned, the property was in value greatly in excess of the amount which was paid for it, is immaterial where it appears that the property at the time of the assignment was of uncertain value, and that it subsequently increased in value through more economical administration and additional capital.

Argued Nov. 5, 1895. Appeal, No. 227, Oct. T., 1895, by garnishee from judgment of C. P. No. 1, Allegheny County, Dec. T., 1893, No. 768, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Attachment execution. Before SLAGLE, J.

At the trial it appeared that in the early part of 1891, E. M.

Hukill had organized the West Penn Gas Company, having a nominal capital of $275,000 of five thousand five hundred shares of the par value of $50.00 each. Mr. Hukill was the owner of all of this stock excepting four shares. At this time, and for a number of years prior thereto, Mr. Hukill was indebted to Eliza Davis' husband for the indebtedness covered by her judgment, but for some reason he had not paid this debt. Early in 1893, while drilling a well to produce gas for the West Penn Gas Company, Hukill struck a remarkable vein of pure water and he conceived the idea of piping this water to Pittsburg for drinking purposes, and for such purpose organized the Apollo Water Company, of which he was the sole owner. For carrying out this latter undertaking, Hukill borrowed money upon every share of stock of the West Penn Gas Company which he owned from banks in various parts of the country, upon a large part of which loans, as well as others, Yoder was his accommodation indorser or guarantor. The Water Company proved a financial failure. In this condition the panic, commencing in June, 1893, caught Hukill. In the latter part of September, 1893, Hukill told Yoder that he was at the end of his string; that he had borrowed every dollar he could raise on the West Penn Gas Company stock, and unless something was done to carry it along, he would be compelled to give up, and make an assignment. He proposed to Yoder that they go and see the banks holding the collateral, and ask them to take the stock and operate the company until he could make a resale of it. This the banks refused to do. Hukill then suggested that as Yoder was already liable for a considerable portion of this indebtedness, that he, Yoder, should pay these claims, and take the stock, securing them, and acquire the balance of the stock of the company, and hold the company intact, allowing Hukill to manage it, as Yoder knew nothing about the gas business. Yoder entered into this arrangement, borrowed money on his assets, lifted the obligations on which he was indorser, paid off other indebtedness of Hukill by purchasing the collateral attached to them, and Hukill demanded and Yoder delivered up to him all of his notes thus paid. Yoder induced a friend, S. W. Vandersaal, to invest in the stock, they two thus acquiring all the stock which Hukill had formerly owned, excepting about two hundred shares held by Spang,

Chalfant & Co.   Hukill under an arrangement with Yoder, after the transfer, took up the matter of sale of the plant, made strenuous efforts in several directions to sell it and failed.   As Hukill was unable to carry out his expectations, Yoder and his friend Vandersaal gave their active attention to the company's business, put in additional capital, acquired new gas territory which proved to be good, and made the undertaking a financial success.   Hukill, having abandoned all attempts to sell the property, voluntarily went to Mrs. Davis and confessed a judgment to her for the debt he owed her husband and which had remained unpaid for years, and on this judgment she issued this attachment, making L. T. Yoder the garnishee.

Other facts appear by the opinion of the Supreme Court.

The court charged in part as follows :

[Then there is another rule, and it is this : that though a debtor has a· right to prefer a creditor, he has no right to retain any interest in the property himself.   He has no right to turn over the property, retaining an interest and covering it up and thus hindering and delaying his creditors.   And even though there was no actual fraud intended, if the transaction was merely for the purpose of hindering creditors, it renders it void and fraudulent as far as the creditors are concerned.   It is claimed in this case that though there was no actual fraud intended between these parties, and they did not turn over this property with a view of defrauding the creditors, that it was done with the intention of preventing them from levying upon it and selling it, or selling the interest of Mr. Hukill in it, and that thereby they were hindered, if not defrauded.] [2]   Both of these matters seem to turn, after all, upon the question of the fairness of the purchase money price.   However, I ought to say this; that if the purpose was to hinder and delay creditors only, or if the purpose was to defraud creditors, you must further find, in order to affect the title of Mr. Yoder, that he was a party to that transaction ; that it was the intention of Mr. Hukill to hinder, delay or defraud his creditors, and that Mr. Yoder knew that that was his intention, or had reason to know and ought to have known, under the circumstances, that that was his intention and that the thing was effected with that view.

[So, as I say, all of these questions possibly depend largely upon whether or not this was, under the circumstances, a fair

transaction.  Now, as to the first point, Mr. Hukill says that he told Mr. Yoder when he first saw him, that his creditors were pressing him, and told him how much he owed them, and that it would be best that this property should be put out of their reach, because if they levied upon it, though they might get nothing out of it, that it would annoy the parties who had it in pledge, and it might work great injury all around.] [3]    That· is as I understood Mr. Hukill.   I believe Mr. Yoder said that he had not told him anything of that sort, but he told him that his creditors were pressing him, and he was tired of being " cussed and dunned " by them.   Now, some of these things may have been said afterwards, and some before, and these little discrepancies between witnesses must be reconciled, if you can do it, in view of the fact that they are liable to put what was said at one time at another time, which sometimes makes a con- siderable difference.

However that may be, the question for you to determine is, was that intended either to hinder, delay or defraud creditors ? If it was, Mr. Yoder will have to account for the property in some way.   Now, in reference to that, it will not do to take matters as they are now.   You must go back to the time at which this transaction took place, and you must view all the circumstances surrounding the parties at that time.   You have a right to take into consideration the condition of business gen- erally in the community, and the surroundings of the parties and everything that goes to illustrate what their ideas and pur- poses were on both sides, because, as I said, you must find that Mr. Yoder had this intention as well as Mr. Hukill, in order to affect his title, because, as creditor he had a right to take his pay; he had a right to take it in property, if he could get it and could not get it in money, but he had no right, in doing that, to cheat and defraud others, or hinder and delay them.

Defendant's point among others was as follows :

1. That under all the testimony in the case, the verdict must be for the defendant.   *Answer :*  Refused. [1]

Verdict and judgment for plaintiff for $18,004.10.   The gar- nishee appealed.

*Errors assigned* were (1–3) above instructions, quoting them.

*Willis F. McCook, W. C. Moreland* with him, for appellant.—
The testimony shows that there was no agreement between
Yoder and Hukill by which the latter was to have any interest
or equity in this stock, until after the title to the whole of it
had passed out of him and had become vested in Mr. Yoder, and
he had reorganized the company and taken charge of it.

If a debtor and creditor, with an honest intent, enter into an
agreement, the contemplated effect of which is to postpone the
claims of other creditors, it is not a fraud. It is the intent, not
the effect, which determines the character of the act. Covan-
hovan v. Hart, 21 Pa. 495.

The intent to defraud must be established either by direct
proof or by facts sufficient to warrant a presumption of its ex-
istence clearly proved. It is not enough to charge fraud and
prove in support thereof slight circumstances of suspicion only.
Jones v. Lewis, 148 Pa. 234.

It has never been adjudged a fraud in this state for a pur-
chaser of property to assist a debtor in selling it, where the
purpose of the debtor is to convert into money, in order that he
may pay his creditors, and especially, where the full terms of the
sale and arrangement of purchase testified to, comprehends and
contemplates the payment of every creditor the debtor has.

*D. F. Patterson,* for appellee.—The forms and devices of
fraud are legion, and it would be vain to attempt to enumerate
or define them, but it may be said as a general rule, that to
impeach the payment or securing of an actual debt there should
be evidence tending to show either :

First. Some other advantage or benefit to the debtor beyond
the discharge of his obligation, or

Secondly. Some other benefit to the creditor, beyond mere
payment of his debt, or

Lastly. Some injury to the other creditors beyond mere
postponement to the debt preferred.

In this case, the evidence not only tends to show the existence
of one of these conditions, but it clearly shows the existence of
all three : Werner v. Zierfuss, 162 Pa. 360 ; Kepner v. Burk-
hart, 5 Pa. 478 ; York County Bank v. Carter, 38 Pa. 446 ;
Covanhovan v. Hart, 21 Pa. 495 ; Uhler v. Maulfair, 23 Pa.
481 ; Reinheimer v. Hemingway, 35 Pa. 432 ; Knight v. Kid-

der, 1 Atl. Rep. 149; Bentz v. Rockey, 69 Pa. 71; Connelly v. Walker, 45 Pa. 449 ; Kaine v. Weigley, 22 Pa. 179.

OPINION BY MR. JUSTICE MITCHELL, January 6, 1896 :

It is conceded that no fraud in fact was intended by the appellant. The learned judge charged the jury on that basis, saying in his instructions on the measure of damages, "if it had been a case of actual fraud there would have been no difficulty about it, he (Yoder) would have had to pay the full value of this stock because he could have taken no benefit by it." The question is therefore, was there evidence to support an inference of fraud in law.

The circumstances as shown by all the testimony were these. The Gas Company had been prosperous, but had been got into difficulties by Hukill's operations with the Water Company. As he was the owner of all the shares in the Water Company and all but four in the Gas Company, financial difficulty for him either personally or as representing the Water Company, of course meant like difficulty for the Gas Company. In fact every share that he owned in the latter had been pledged for loans to carry the former, and in September, 1893, he had in his own phrase come to the end of his string. The Water Company's paper was out and could not be met. The creditors were threatening to sue. Hukill was indorser to the extent of $20,000, and as he says, the creditors seemed to think the Gas Company ought to father the debts of the Water Company, and made threats that they would pursue the Gas Company and his stock. As already said every share he owned was pledged for loans, and he was of opinion that if attached and his equity in it sold, "the whole thing would become complicated, and waste would follow," but that if it could all be held together until he had an opportunity to sell it as a whole, there would be enough realized to pay all the debts, both the company's and his own. In this situation Hukill called upon appellant, stated the foregoing facts and "told him that something would have to be done." The significance of this last remark lies in the fact that appellant was a creditor of Hukill for $5,000, apparently unsecured, and was contingently liable for $10,000 more, as indorser on the notes of Hukill held by various banks. He had therefore a direct and considerable pecuniary interest in Hukill's

ability to meet his obligations. The latter's view was as already said that if the stock could be held together until a sale of the whole plant could be made, enough money would be realized to pay all claims, and appellant first made an effort to induce the banks who held the stock as collateral to act in concert to carry out this plan. They however refused to come into it, and then appellant, with the assistance of Vandersaal whom he induced to join him, paid the amounts due the banks, took assignments of the stock, and held it as owners, for repayment and possible profit. This is the substance of the appellant's action which plaintiff complains of, and on which the jury found their verdict.

Two additional circumstances are relied upon to sustain the claim of legal fraud. Appellant at the end of the transaction was a creditor of Hukill for about $36,000, made up of his original claim, and the amount he had advanced to repay the banks. He then agreed with Hukill that in case the latter sold the Gas Company plant, he might have half the excess over $40,000, and it was urged that this was a fraudulent benefit to the debtor, which tainted the whole transaction. But the undisputed testimony is that this agreement was not made until after appellant had become the owner of the whole stock, and was looking around for means of realizing on it. Hukill says distinctly that nothing was said of any money to come to him until Yoder had got control of all the stock, and elected a new board of directors. Then it was agreed he should have a commission in case he succeeded in selling. Of course it was previously understood that there was to be a sale. The whole plan hinged upon that, and the object of putting in more money to redeem the stock and hold it together, was to get the benefit of a sale of the plant as a whole. This is the closest point in the case and might justify an unfavorable view by the jury, if there were any doubt or conflict in the evidence as to the time this agreement was made, but there is not. Appellant had become the owner of the property, not with the idea of running the company, but to get out of his liabilities in regard to it without loss. To do this he must sell, and there was no legal objection, under the circumstance, to his employing the previous owner to make the sale, and paying him even a liberal commission.

The other circumstance urged as sustaining the idea of fraud.

is the excessive value of the stock, as compared with what appellant paid for it.　A clear excess of value of property transferred, over the debt due and a reasonable margin for delay and expense in converting the property into money, is evidence of fraudulent intent.　But it is conceded here that there was no actual fraud intended, and the excess of value is too uncertain and contingent to be a safe basis for an inference of law. Hukill says indeed that the value of the stock was "assumed" to be $20.00 a share, but this assumption was on the basis of a sale of the whole fifty-one hundred shares for $100,000, which the event proved could not be made.　Before the difficulties of the Gas Company arose, or at least were known, the stock was pledged for loans running from $2.75 to $14.00 a share and the banks refused to loan any further amounts on it.　The small number of shares pledged at $14.00 were sold by the holders, Spang Chalfant & Co. and did not bring the amount of the loan for which they stood as collateral.　And finally Vandersaal who seems to have been the first to make a careful business-like examination of the Gas Company's affairs, testifies that he "didn't think we could go out in the market and sell the plant for enough to pay its debts," and he was willing to go out for the amount he had put in, and lose the interest.　This evidence of the value at the time is not overcome by the fact that the company subsequently became profitable under the new management of Vandersaal, with closer attention, more economical administration and additional capital, for all of which the jury do not seem to have made any allowance at all.　In this review we have taken the evidence of Hukill and Yoder, on which the case must rest, with every unfavorable inference that it will fairly support, and are of opinion that it is not sufficient to sustain the conclusion of fraud in law any more than in fact.　If appellant had been a volunteer the result would have been different.　But he was a bona fide creditor to a large amount, with still greater contingent liabilities in case Hukill failed to pay. He took a large property to secure himself, but to do so he was obliged to put in additional capital to double the amount of his first risk, and to take a property of uncertain and shifting value which might or might not reimburse him.　The difference between the position of a volunteer who comes forward to assist a failing debtor to delay or hinder his creditors, and that of a

bona fide holder of an existing debt, has been recently stated in Werner v. Zierfuss, 162 Pa. 360. Appellant stood in that position in regard to Hukill, and we see no sufficient evidence that in his action he exceeded his legal rights. The defendant's first point should have been affirmed, and a verdict directed in his favor.

Judgment reversed.